[Crim. No. 16511. In Bank. Aug. 7, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
WILMOUT HORN et al., Defendants and Appellants.

## COUNSEL

Samuel Crowe and Robert E. Dougherty, under appointments by the Supreme Court, for Defendants and Appellants.

Evelle J. Younger, Attorney General, Herbert L. Ashby, Chief Assistant Attorney General, William E. James, Assistant Attorney General, Mark L. Christiansen and Derald E. Granberg, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**TOBRINER, J.**—Defendants Wilmout Horn and Virgil Lee Feltner appeal from convictions, following jury verdict, of conspiracy to commit first degree murder (Pen. Code, § 182), of arson (Pen. Code, § 447a), and of unlawful manufacture of a fire bomb (Pen. Code, § 452). Evidence submitted at the trial showed that at the time of the conspiracy defendants were so intoxicated that they may have lacked the capacity to entertain malice aforethought, and consequently that the conspiracy should be classed as one to commit voluntary manslaughter. The trial court, however, erroneously refused to instruct the jury that diminished capacity arising from intoxication can reduce a homicide to manslaughter and erroneously compelled the jury to choose between finding defendants guilty of conspiracy to commit first degree murder or innocent of any conspiracy at all. The court's error in instructions and the form of verdict seriously prejudiced the defense to the conspiracy count and requires a reversal of that conviction. We find no error, however, as to the convictions for arson and manufacture of a fire bomb; we affirm those convictions.

On the evening of May 10, 1970, defendants and Billy Horn, the brother of defendant Wilmout Horn, decided "to get rid of Elmer [Damron]." Upon meeting four juveniles, defendant Horn offered to pay them $20 each to bomb or burn "a house"; the juveniles agreed. Defendant Horn drove the juveniles to Elmer Damron's home, and there defendants Horn and Feltner described how they wanted the house blown up.

Defendants, Billy Horn, and the juveniles then went to Billy's house where they made five or six fire bombs. Defendants and the juveniles returned to the vicinity of Damron's house. The juveniles lit the bombs,

throwing them at the house; they then ran down an alley where Billy Horn picked them up in his car.

Awakened by the explosions, Damron called the fire department. Outside the house the firemen and policemen found three fire bombs which had failed to explode, and fragments of other bombs. A short time later, while Damron was standing near his house discussing the matter with Deputy Sheriff Knadler, Billy Horn drove by. Pointing out Horn's vehicle, Damron said "there is the one I suspect." Detective Williams then pursued and stopped Horn's car, detained Horn, and obtained his permission to search the car. After the search disclosed empty gasoline containers, Williams went to Billy's home where he found the four juveniles and took them into custody. Information provided by the juveniles and by Janice Horn, Billy's wife, led to the arrest of defendants.

Defendants Horn and Feltner testified that they consumed large quantities of liquor and beer during the afternoon and evening of May 10, and at the time of the conspiracy were highly intoxicated. This testimony was corroborated by the four juveniles, by Billy and Janice Horn, and by other persons who had observed defendants during the evening.

The trial court instructed the jury that conspiracy to commit murder "is an agreement between two or more persons to commit the public offense of murder and with the specific intent to commit such offense. . . ." It defined murder as "the unlawful killing of a human being with malice aforethought"; further instructions defined "malice" and "aforethought." Noting that conspiracy requires specific intent, the court instructed that "if the evidence shows that the defendant was intoxicated at the time of the alleged offense, the jury should consider his state of intoxication in determining if defendant had such specific intent." A subsequent instruction permitted the jury to consider any "abnormal mental or physical condition, however caused," that might affect defendant's specific intent.

The trial court did not instruct the jury on the elements of second degree murder or manslaughter, nor inform it that diminished capacity caused by intoxication may reduce a homicide below first degree murder. The verdict form required the jury to choose only between finding the defendants guilty of conspiracy to commit murder in the first degree, or not guilty on that count. The jury found defendants guilty of conspiracy to commit first degree murder, of arson, and of unlawful manufacture of a fire bomb. Defendants were sentenced to life imprisonment.[1]

---

[1] Billy Horn was charged in the same information as the present defendants, but was tried separately and convicted. He is not a party to this appeal.

We shall explain that proof of a conspiracy to commit a specific offense requires proof that the conspirators intended to bring about the elements of the conspired offense. Since evidence of diminished mental capacity can show that a homicide was committed without premeditation or malice aforethought, reducing that homicide to second degree murder or manslaughter, such evidence may also serve to classify a conspiracy to commit a homicide as one to commit second degree murder or manslaughter. Although under the facts of the present case the trial court's failure to submit the offense of conspiracy to commit second degree murder to the jury is not error, its failure to instruct on the elements of voluntary manslaughter, or to permit the jury to return a verdict of conspiracy to commit voluntary manslaughter, constitutes prejudicial error.

Penal Code section 182, after listing certain felonies, not including murder or manslaughter, provides that when two or more persons "conspire to commit any other felony, they shall be punishable in the same manner and to the same extent as is provided for the punishment of the said felony. If the felony is one for which different punishments are prescribed for different degrees, the jury or court which finds the defendant guilty thereof shall determine the degree of the felony defendant conspired to commit. If the degree is not so determined, the punishment for conspiracy to commit such felony shall be that prescribed for the lesser degree, except in the case of conspiracy to commit murder, in which case the punishment shall be that prescribed for murder in the first degree."[2] To comply with this section, the trier of fact must determine the identity of the conspired felony, and if that felony is divided into degrees, the degree of the felony.

■ Homicide itself is not a crime, but a class of crimes, graduated according to the mental state and personal turpitude of the offender. (*People* v. *Holt* (1944) 25 Cal.2d 59, 89 [153 P.2d 21].) Consequently, when the case involves a conspiracy to commit a homicide, the duty will devolve upon the jury to determine whether the homicide that the defendants conspired to commit was a first degree murder—a killing char-

---

[2]At the time of defendants' trial, the punishment for first degree murder was either death or life imprisonment at the discretion of the jury. (Pen. Code, § 190.) Since under the language of section 182 conspiracy to commit first degree murder was punishable "in the same manner as . . . the said felony," defendants faced a possible death penalty. Apparently neither defendants, nor counsel, nor the court was aware of this possibility; after the verdict was returned on the issue of guilt, the court dismissed the jury without a penalty trial. In any case the subsequent decisions of *People* v. *Anderson* (1972) 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880], and *Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726] would bar imposition of the death penalty upon defendants.

acterized by malice aforethought. Plainly a jury could not properly discharge its duty if it were ignorant of the relationship between diminished capacity arising from intoxication and the classes and degrees of homicide.[3]

The Attorney General, however, argues that conspiracy is a crime without degrees or lesser included offenses, and hence that the defense of diminished capacity goes not to the conspired homicide but only to the conspirators' capacity to agree among themselves. This argument mistakes the element of intent in the crime of conspiracy, and overlooks the duty of the jury under Penal Code section 182 to determine the crime, and the degree of the crime, which defendants conspired to commit.

■ Conspiracy is a "specific intent" crime. (*People* v. *Marsh* (1962) 58 Cal.2d 732, 743 [26 Cal.Rptr. 300, 376 P.2d 300]; *People* v. *Aday* (1964) 226 Cal.App.2d 520, 533 [38 Cal.Rptr. 199]; *People* v. *Bernhardt* (1963) 222 Cal.App.2d 567, 586 [35 Cal.Rptr. 401]; *People* v. *Bowman* (1958) 156 Cal.App.2d 784, 797 [320 P.2d 70].) The specific intent required divides logically into two elements: (a) the intent to agree, or conspire, and (b) the intent to commit the offense which is the object of the conspiracy. (Harno, *Intent in Criminal Conspiracy* (1941) 89 U.Pa. L.Rev. 624, 631; *Developments in the Law—Criminal Conspiracy* (1959) 72 Harv.L.Rev. 920, 935; Comment (1952) 26 So.Cal.L.Rev. 64, 67.) To sustain a conviction for conspiracy to commit a particular offense, the prosecution must show not only that the conspirators intended to agree but also that they intended to commit the elements of that offense.

*People* v. *Bowman* (1958) 156 Cal.App.2d 784 [320 P.2d 70], states the principle: "[T]he accused must have had a specific intent to do an unlawful act or to do a lawful act by unlawful means. This, in one case,

---

[3]It is now well settled that evidence of diminished mental capacity caused by intoxication can show that a homicide was committed without premeditation or malice aforethought, lowering that offense to second degree murder or manslaughter. (See *People* v. *Tidwell* (1970) 3 Cal.3d 82, 86 [89 Cal.Rptr. 58, 473 P.2d 762]; *People* v. *Graham* (1969) 71 Cal.2d 303, 315 [78 Cal.Rptr. 217, 455 P.2d 153]; *People* v. *Conley* (1966) 64 Cal.2d 310, 322 [49 Cal.Rptr. 815, 411 P.2d 911]; *People* v. *Baker* (1954) 42 Cal.2d 550, 573 [268 P.2d 705].) Thus when a defendant presents evidence "deserving of consideration" (see *People* v. *Tidwell* (1970) 3 Cal.3d 82, 85 [89 Cal. Rptr. 58, 473 P.2d 762]; *People* v. *Conley* (1966) 64 Cal.2d 310, 319 [49 Cal.Rptr. 815, 411 P.2d 911]) to show that, by reason of intoxication, he did not premeditate or act with malice, the court must instruct on the defense of diminished capacity and advise the jury of the lesser offenses of which it could find the defendant guilty. (*People* v. *Tidwell* (1970) 3 Cal.3d pp. 85, 86 [89 Cal.Rptr. 58, 473 P.2d 762]; *People* v. *Mosher* (1969) 1 Cal.3d 379, 390 [82 Cal.Rptr. 379, 461 P.2d 659]; *People* v. *Graham* (1969) 71 Cal.2d 303, 315 [78 Cal.Rptr. 217, 455 P.2d 153]; *People* v. *Castillo* (1969) 70 Cal.2d 264, 269 [74 Cal.Rptr. 385, 449 P.2d 449]; *People* v. *Conley* (1966) 64 Cal.2d 310, 318 [49 Cal.Rptr. 815, 411 P.2d 911].)

may involve proving that he had the intent to commit murder; in another, that he had the intent to steal; in another, that he had the intent to violate a statute. . . . In the present case it was incumbent on the People to prove that defendants had the specific intent to violate the statutes named in . . . the information; and defendants had the right to show that they had no such intent. The court erred in excluding evidence offered by defendants for that purpose . . . ." (156 Cal.App.2d at pp. 797, 799; see *People* v. *Marsh* (1962) 58 Cal.2d 732, 743-744 [26 Cal.Rptr. 300, 376 P.2d 300]; *People* v. *Bernhardt* (1963) 222 Cal.App.2d 567, 592 [35 Cal.Rptr. 401].)

As summarized in *Developments in the Law—Criminal Conspiracy* (1959) 72 Harv.L.Rev. 920, 939-940: "Under any rationale of the crime, it is certain that conspiracy to commit a particular substantive offense cannot exist without *at least* the degree of criminal intent necessary for the substantive offense itself. For example, a conspiracy to deprive someone of his property is not a conspiracy to [commit] the crime of larceny unless the intention is to deprive him of that property permanently. When the intent necessary for the particular substantive offense does not exist, a conspiracy may still be proved under a general conspiracy law if the intent is nevertheless wrongful, but not a conspiracy to commit that particular substantive offense."

It is contended that since defendants are charged with conspiracy, not with murder, that only two issues arise: did defendants conspire, and did they have the capacity to conspire? But resolution of only those two issues does not dispose of the case. ■ *Under Penal Code section 182 the jury must also determine which felony defendants conspired to commit*, and if that felony is divided into degrees, which degree of the felony they conspired to commit. The jury cannot perform that task unless it is instructed on the elements of both the offense defendants are charged with conspiring to commit, and any lesser offense defendants assert to be the true object of the conspiracy.[4]

Moreover, section 182 clearly makes the punishment for conspiracy turn on the nature and degree of the conspired offense. Thus even if a

---

[4]Assume, for example, that defendants, accused of conspiracy to commit grand theft, admit the conspiracy but alleged the object was a petty theft. Obviously the jury would have to be instructed on the difference between the two crimes. Or that defendants, accused of conspiracy to commit burglary, ask the jury to fix that crime as a burglary of the second degree; obviously the court would have to instruct on the difference between first and second degree burglary. Likewise here, in which defendants assert that the object of their conspiracy was manslaughter, the jury should be instructed on the mental state which distinguishes manslaughter and murder.

defendant could be convicted of conspiracy in the abstract, he could not be punished until the trier of fact ascertained the criminal object of the conspiracy. To determine whether the object of defendants' conspiracy in the present case was the commission of a first degree murder, the trier of fact obviously would need to know the elements of that offense.

The Attorney General contends, however, that any conspiracy to commit a homicide is, of logical necessity, a conspiracy to commit first degree murder. He relies on *People* v. *Kynette* (1940) 15 Cal.2d 731 [104 P.2d 794], which stated that "a conspiracy to commit murder can only be a conspiracy to commit murder of the first degree for the obvious reason that the agreement to murder necessarily involves the 'wilful, deliberate, and premeditated' intention to kill a human being." (15 Cal.2d at p. 745.) This language, however, refers only to the degrees of murder, and offers no support for the Attorney General's assertion that all conspiracies to commit homicide must be classed as conspiracies to commit murder.[5]

Perhaps as of 1940, when *Kynette* was decided, one could argue that proof that a defendant entered into an agreement to commit a homicide demonstrated beyond reasonable doubt his capacity to premeditate and to entertain malice aforethought. But today premeditation no longer means merely advance planning of the crime; it requires proof that the defendant "could maturely and meaningfully reflect upon the gravity of his contemplated act." (*People* v. *Wolff* (1964) 61 Cal.2d 795, 821 [40 Cal.Rptr. 271, 394 P.2d 959]; *People* v. *Sirhan* (1972) 7 Cal.3d 710, 727 [102 Cal.Rptr. 385, 497 P.2d 1121].) Furthermore, a conviction of murder in any degree requires proof of malice aforethought; since *People* v.

---

[5]*Kynette's* assertion that a conspiracy to commit murder is always a conspiracy to commit first degree murder is inconsistent with the present language of Penal Code section 182. When *Kynette* was decided, section 182 provided simply that conspirators to commit a felony "shall be punishable in the same manner and to the same extent as provided for the punishment of the commission of the said felony." The current section 182, enacted in 1955, is much more specific: "If the felony is one for which different punishments are prescribed for different degrees, the jury or court which finds the defendant guilty thereof shall determine the degree of the felony defendant conspired to commit. If the degree is not so determined, the punishment for conspiracy to commit such felony shall be that prescribed for the lesser degree, except in the case of conspiracy to commit murder, in which case the punishment shall be that prescribed for murder in the first degree."

As this language is written and punctuated, it plainly authorizes the trier of fact to return a verdict finding conspiracy to commit murder in the second degree. *Only* if the trier of fact fails to determine the degree is a conspiracy to commit murder punished as one to commit first degree murder. Since the Legislature has authorized a verdict of conspiracy to commit second degree murder, it clearly does not believe that crime to be a logical impossibility.

*Gorshen* (1959) 51 Cal.2d 716, 727 [336 P.2d 492], malice can be rebutted "by a showing that the defendant's mental capacity was reduced by mental illness, mental defect or intoxication." (*People* v. *Graham* (1969) 71 Cal.2d 303, 315 [78 Cal.Rptr. 217, 455 P.2d 153].)

■ In view of these decisions, it can no longer be successfully argued that objective proof that defendants planned a homicide in advance conclusively proves that homicide was a first degree murder. The planning itself may have been affected by a defendant's impaired mental capacity, as in *People* v. *Wolff* (1964) 61 Cal.2d 795 [40 Cal.Rptr. 271, 394 P.2d 959], or by his intoxication, as in *People* v. *Conley* (1966) 64 Cal.2d 310 [49 Cal.Rptr. 815, 411 P.2d 911]. Consequently the fact that a killing was planned in advance, whether individually or in concert, does not prove that the planner acted with malice or after meaningful reflection upon the gravity of his contemplated act. If, gripped by mental illness, intoxication, or heat of passion, a man kills without malice, he commits manslaughter; it necessarily follows that if this same man, under those same circumstances, conspires to kill, he conspires to commit manslaughter. Even though his befuddled brain still possesses the bare capacity to agree to the conspiracy, his inability to appreciate the gravity of his act, or to harbor malice aforethought compels us to classify the object of his conspiracy as a manslaughter.

There is another fundamental reason why we cannot treat all conspiracies to commit homicide as conspiracies to commit first degree murder. In *People* v. *Holt* (1944) 25 Cal.2d 59, 89 [153 P.2d 21], we stated that "Dividing intentional homicides into murder and voluntary manslaughter was a recognition of the infirmity of human nature. Again dividing the offense of murder into two degrees is a further recognition of that infirmity and of difference in the quantum of personal turpitude of the offenders. The difference is basically in the offenders . . . ." Since the punishment for conspiracy to commit a homicide is the same as the punishment for the conspired felony (Pen. Code, § 182), we must undertake this same delicate weighing of personal turpitude of conspirators to commit homicide. If because of intoxication or mental incapacity the personal turpitude of a conspirator indicates a classification of manslaughter, it would be wholly unjust to punish him as a first degree murderer solely because he acted in concert with another person of equal diminished capacity.

■ We find no error, however, in the trial court's failure to instruct on the elements of second degree murder, or to permit the jury to return a verdict of conspiracy to commit second degree murder. Penal Code

section 189, as of the date of the conspiracy, provided in part that "[a]ll murder which is perpetrated by means of a *bomb,* poison, lying in wait, torture, or by any other kind of wilful, deliberate and premeditated killing . . . is murder of the first degree." (Italics added.) Under this section, if a homicide is committed with malice aforethought, the use of one of the means listed compels classification of that killing as first degree murder. (See *People* v. *Mattison* (1971) 4 Cal.3d 177, 182-183 [93 Cal.Rptr. 185, 481 P.2d 193].)

The record indisputably shows that defendants conspired to commit a homicide by the use of a "bomb" as defined in section 189.[6] Thus if defendants here conspired to commit murder, as distinguished from manslaughter, that murder was a first degree murder. On this record a verdict of conspiracy to commit second degree murder would be contrary to law.

■ We find, however, that the trial court erred in failing to instruct the jury on the relationship of diminished capacity to the elements of voluntary manslaughter, in failing to advise the jury that they could find defendants guilty of conspiracy to commit manslaughter, and in submitting to the jury a verdict form which omitted that verdict. By facing the jury with the bare alternatives of finding defendants guilty of conspiracy to commit first degree murder, or totally innocent of conspiracy to commit homicide, the trial court effectively emasculated the defense of diminished capacity.[7]

This error requires reversal of the conviction for conspiracy to commit first degree murder. In *People* v. *Sedeno* (1974) 10 Cal.3d 703 [112 Cal. Rptr. 1, 518 P.2d 913], we recently reaffirmed our holding in *People* v. *Modesto* (1963) 59 Cal.2d 722 [31 Cal.Rptr. 225, 382 P.2d 33] that "a defendant has a constitutional right to have the jury determine every material issue presented by the evidence; that an erroneous failure to

---

[6]Section 189 stated that "As used in this section, 'bomb' includes any device, substance, or preparation, other than fixed ammunition or fireworks regulated under Part 2 (commencing with Section 12500) of Division 11 of the Health and Safety Code, which is designed to cause an explosion and is capable of causing death or serious bodily injury."

[7]As we stated in *People* v. *Tidwell* (1970) 3 Cal.3d 82, 87 [89 Cal.Rptr. 58, 473 P.2d 762]: "There is no basis for holding that the failure to give instructions on [lesser offenses] in the context of a diminished capacity defense constituted invited error attributable to defendant's counsel. In the absence of anything in the record disclosing that counsel had 'a deliberate tactical purpose in suggesting, resisting, or acceding to an instruction,' we must assume that counsel merely failed to request the additional instructions because of neglect or mistake, which would be insufficient to nullify the trial court's obligation to properly instruct the jury on all the issues presented in that case."

instruct on a lesser included offense constitutes a denial of that right; and that such error cannot be cured by weighing the evidence and finding it not reasonably probable that a correctly instructed jury would have convicted the defendant of the lesser included offense." (*People* v. *Sedeno, supra,* 10 Cal.3d at p. 720.)

*Sedeno* did overrule *Modesto* to the extent that the latter case held that failure to instruct on a lesser included offense is necessarily prejudicial "even though it reasonably appears from the verdict and the instructions given that the jury rejected the evidence tending to prove the lesser offense." (*People* v. *Sedeno, supra,* 10 Cal.3d at p. 721.) In the present case, however, the instructions and verdict form compelled the jury to choose between a verdict of conspiracy to commit first degree murder, and an acquittal of any charge of conspiracy; the verdict returned offers no basis on which an appellate court could infer that the jury rejected defendants' evidence that diminished capacity, caused by intoxication, reduced their conspiracy to one to commit manslaughter.[8]

We have considered the other contentions of defendants but find them without merit.[9]

As to count 1 of the information (conspiracy to commit murder in the first degree), the judgments are reversed; in all other respects the judgments are affirmed.

Wright, C. J., Burke, J., and Sullivan. J., concurred.

**MOSK, J.**—I dissent.

Under California law there are no degrees of conspiracy. Defendants tried for the crime of conspiracy are either guilty as charged or not guilty; the trier of fact has no comfortable option of reducing conspiracy to a lesser offense.

---

[8]Any language contrary to this opinion in *People* v. *Kynette* (1940) 15 Cal.2d 731 [104 P.2d 794], is disapproved.

[9]Damon's identification of Billy Horn as the probable perpetrator of the crime gave the police sufficient ground to detain and question Billy (see *People* v. *Hogan* (1969) 71 Cal.2d 888, 890-891 [80 Cal.Rptr. 28, 457 P.2d 868]); Billy consented to the search of his car. Defendant's contention that defense counsel incompetently failed to raise the issue of the alleged illegality of the arrest of the juveniles rests on speculative grounds. Defendants thus fail to meet their burden of showing inadequate representation by counsel "not as a matter of speculation but as a demonstrable reality." (*Adams* v. *U. S.* ex rel. *McCann* (1942) 317 U.S. 269, 281 [87 L.Ed..268, 276, 63 S.Ct. 236, 143 A.L.R. 435]; *People* v. *Reeves* (1966) 64 Cal.2d 766, 774 [51 Cal. Rptr. 691, 415 P.2d 35].)

But, argue the majority, Penal Code section 182 provides that if the felony the defendants conspire to commit consists of degrees, then the trier of fact must ascertain the degree. True enough. But where the majority then go awry is in leaping from the code section to the untenable conclusion that the defendants' *mental capacity to conspire* is to be determined by consideration of the planned subordinate felony, rather than solely by reference to the crime itself: conspiracy.

The degree aspect of Penal Code section 182 has no relevance to mental capacity. The section bears a relationship to the substance of conspiracy to commit such offenses as robbery and burglary, which are divided into degrees. For example, if two defendants conspire to rob, the trier of fact must determine whether the planned robbery was to be committed by torture or with a deadly weapon: if so, the crime is conspiracy to commit robbery of the first degree; if not, it is conspiracy to commit robbery of the second degree (Pen. Code, § 211a). The degree is significant because of the methods planned to be used; the degree has no relevance to the mental capacity to plan or conspire to rob. A similar example is found in conspiracy to commit burglary. The court or jury must ascertain if the planned burglary was to be of an inhabited dwelling, or perpetrated in the nighttime, or with a deadly weapon, and from those circumstances the trier of fact determines whether the conspiracy was to commit burglary of the first or second degree (Pen. Code, § 460). Again, the degree is a factor because of the methods planned to be used, but it is unrelated to the mental capacity to plan or conspire to commit burglary.

Murder, too, consists of degrees. As with other offenses divisible into degrees, when the charge is conspiracy to commit murder, the trier of fact looks to the method planned to be used in the proposed killing in order to ascertain the degree. If the planned method is the use of a destructive device or explosive, as in this instance, then the court or jury is bound by Penal Code section 189 which specifically declares such homicides to be murder in the first degree. But as with robbery and burglary, the method planned to be used for the subordinate felony has no relevance to the capacity to commit the crime charged. And it bears constant repetition that the crime charged here was not murder, but conspiracy.

Of course, diminished capacity is an issue in this case. But where the majority fall into error is in relating diminished capacity to murder, instead of to the charge of conspiracy. The *Wells-Gorshen* instruction, properly given by the trial court, alerted the jury to the necessity of determining the capacity of defendants to conspire. Since there are no degrees of con-

spiracy created by law (*People* v. *Kynette* (1940) 15 Cal.2d 731 [104 P.2d 794]), if defendants' capacity to conspire was diminished the jury would have been compelled to bring in a verdict of acquittal. The guilty verdict indicates the jury found no diminished capacity preventing defendants from conspiring.

A conspiracy is a combination of two or more persons to commit a crime or to do any of the other acts forbidden by Penal Code section 182. The law speaks of a conspiracy as an agreement plus an overt act in furtherance of the agreement. (§ 184; *People* v. *Gordon* (1945) 71 Cal. App.2d 606, 611 [163 P.2d 110].) Conspiracy is a totally independent accusation based upon the criminality attached to an unlawful agreement followed by some act in pursuance of the joint design. (*People* v. *Robinson* (1954) 43 Cal.2d 132, 138 [271 P.2d 865].) The key to the offense is the agreement, not the crime which the conspirators purportedly agree to commit. (*People* v. *Klinkenberg* (1949) 90 Cal.App.2d 608, 635 [204 P.2d 42, 613].) Indeed, it is clear two or more persons may be convicted of conspiracy even though the crime they conspire to commit is frustrated or prevented by events over which they have no control. (*People* v. *Benenato* (1946) 77 Cal.App.2d 350, 357 [175 P.2d 296].)

Thus we must look to the capacity of the defendants to conspire, i.e., to agree between themselves. It seems obvious that the criminal act they agreed to commit is unrelated to their mental ability to agree. (*People* v. *McLaughlin* (1952) 111 Cal.App.2d 781, 789 [245 P.2d 1076].) The issue is: *was their capacity to conspire diminished*? The jury was properly instructed on that query, and by its verdict of guilt found the defendants to have adequate capacity to negotiate a criminal agreement.

But, say the majority, two persons may have the ability to conspire but lack the ability to complete the offense they conspire to commit; therefore they can be convicted of conspiring to commit some lesser offense. In this instance the majority hold that lacking the capacity to conspire to commit first degree murder, the defendants nevertheless may have the capacity to conspire to commit manslaughter. I confess the rationale of this esoteric concept escapes me. If the defendants are unable to conspire to commit one crime because of mental incapacity, it would seem to follow that they would be equally unable to conspire to commit another crime. By the simple device of changing the crime alleged to have been conspiratorially contemplated the law cannot elevate, *mirabile dictu*, the mental capacity of the defendants.

Perhaps somewhat too categorically the *Kynette* case held that "a conspiracy to commit murder can only be a conspiracy to commit murder of

the first degree for the obvious reason that the agreement to murder necessarily involves the 'willful, deliberate and premeditated' intention to kill a human being." (15 Cal.2d at p. 745.) However, if because of diminished capacity, conspiracy to commit murder of the first degree can be reduced to conspiracy to commit murder of the second degree or manslaughter, some mind-boggling possibilities emerge.

Second degree murder is a homicide that is not a wilful, deliberate and premeditated killing (Pen. Code, § 189). But if we accept the existence of conspiracy to commit second degree murder for other than the planned method of killing there can be an agreement, which requires will, deliberation and planning, to commit an act which is characterized by an absence of wilfulness, deliberation and premeditation. In the instant case the majority imply the possibility of conspiracy to commit manslaughter. Voluntary manslaughter is defined as an unlawful killing "upon a sudden quarrel or heat of passion." (Pen. Code, § 192.) While a vivid imagination may be able to conjure up an agreement to have a sudden quarrel, it taxes credulity to suggest a conspiracy to kill in the heat of passion. Or to agree to act "without due caution and circumspection," a characteristic of involuntary manslaughter. Indeed, how can there be a voluntary agreement to commit an involuntary act?

It was to prevent such slides into wonderland that this court decided *Kynette*. It was a sound basic rule prior to the 1965 amendments to Penal Code section 182, and retains its general rationality today, except as to those instances when the planned method of killing falls within the Penal Code section 189 definition of murder in the second degree.

This case is not as distressingly complicated as the unique theory of the majority attempts to make it. There are two simple questions and equally easy answers. First, did the defendants enter into an agreement, i.e., conspiracy to commit an unlawful act? The jury answered affirmatively; the majority would answer affirmatively, though they equivocate not as to the agreement but as to the object of the agreement. Second, did the defendants have the capacity to enter into an agreement, i.e., conspiracy? The jury, properly instructed on *Wells-Gorshen,* answered affirmatively; the majority answer affirmatively as to capacity to agree to one crime but not to another.

Under these circumstances I would affirm the judgment in its entirety.

McComb, J., concurred.